UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Tue Lor,

                    Plaintiff,

    vs.                        REPORT AND RECOMMENDATION

Jo Anne B. Barnhart,
Commissioner of Social
Security,

                    Defendant.        Civ. No. 04-4747 (JNE/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's final decision, which denied her application for Supplemental Security Income ("SSI"). The matter is now before the Court upon the parties' cross-Motions for Summary Judgment. For these purposes, the Plaintiff has appeared by Kathleen M. Davis, Esq., and the Defendant has appeared by Lonnie F. Bryan, Assistant United States Attorney. For reasons which follow, we recommend that the Plaintiff's Motion for Summary

Judgment be denied, that the Defendant's Motion be denied, and that the matter be remanded to the Commissioner for further proceedings consistent with this Report.

## II. <u>Procedural History</u>

The Plaintiff filed an application for SSI on August 13, 2001, in which she alleged that she had become disabled on January 1, 1999. [T. 25, 89-91]. Her claims were denied upon initial review, and upon reconsideration. [T. 60-63, 64-68].

On May 15, 2002, the Plaintiff requested a Hearing before an Administrative Law Judge ("ALJ") and, on January 27, 2003, a Hearing was conducted, at which time, the Plaintiff appeared personally, by an interpreter, and by a non-attorney paralegal advocate of the Legal Aid Society. [T. 25, 33-34]. Thereafter, on May 12, 2003, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 22-30]. The Plaintiff requested an Administrative Review before the Appeals Council which, on September 22, 2004, declined to review the matter further. [T. 9-11]. Thus, the ALJ's determination became the final decision of the Commissioner. <u>Grissom v. Barnhart</u>, 416 F.3d 834, 836 (8th Cir. 2005); <u>Steahr v. Apfel</u>, 151 F.3d 1124, 1125 (8th Cir. 1998); <u>Johnson v. Chater</u>, 108 F.3d 942, 943-44 (8th Cir. 1997); <u>20 C.F.R. §1481</u>.

Subsequent to the unfavorable decision of the ALJ, and prior to the Appeals Council decision, the Plaintiff reapplied for SSI benefits on July 25, 2003. The Social

Security Administration ("SSA") subsequently found the Plaintiff disabled from the date of application -- i.e., from July 25, 2003.  See, <u>Memorandum in Support of Motion for Summary Judgment</u>, <u>Docket No. 11</u>, at 2.  Therefore, the period at issue, here, involves the time period between the date of the initial application, August 13, 2001, and July 25, 2003.  See, <u>Holmstrom v. Massanari</u>, 270 F.3d 715, 717 (8th Cir. 2001). This action was commenced on November 11, 2004.

## III.  <u>Administrative Record</u>

A.  <u>Factual Background</u>.  At the time of the ALJ's decision, the Plaintiff was forty-three (43) years old, and possessed no formal education.  [T. 26].  The Plaintiff had immigrated from Laos in 1980, and is unable to speak, read, or understand English.  [T. 242].  The Plaintiff had four (4) children with her first husband, but does not have custody of them.   [T. 172]. The Plaintiff had two (2) children with a subsequent boyfriend, but those children were removed by Child Protection approximately ten years ago, after she had left them in the care of a nine-year old child, and she has not seen them since.  [T. 37-38, 172].  The Plaintiff also has five (5) children with another boyfriend, who currently lives with her, who are aged three (3), eight (8), nine (9), ten (10), and eleven (11).   [T. 35, 172].

The Plaintiff had prior work experience at several short-term jobs involving potato packing, and placing stickers on objects.   [T. 26].  As related by the Plaintiff, she had become disabled on January 1, 1999, due to various medical conditions.  Id. The Plaintiff alleges that she cannot work due to abdominal pain, which stems from two (2) Caesarian sections, foot problems, pain, depression, poor memory and focus, and suicidal thoughts.  Id.

       1.    Medical Evidence Relating to Physical Impairments.

On October 27, 2000, the Plaintiff underwent surgery to remove bunions from her feet.  [T. 164].  On October 1, 2002, she reported continuing foot pain to her treating physician.  [T. 303].

On May 10, 2001, the Plaintiff began seeing Dr. Carrie Fenna, at University Family Physicians.  [T. 176-78].  At the exam, the Plaintiff reported that she had been experiencing lower back pain, which had persisted for many months.  Dr. Fenna noted that the Plaintiff also reported pain, and discomfort in her right foot, and prescribed ibuprofen to address the Plaintiff's back pain.

On May 24, 2001, Dr. Fenna met with the Plaintiff again.  [T. 173].  Dr. Fenna noted that the Plaintiff reported that the ibuprofen relieved some of the pain in her lower back and right foot.

On November 27, 2001, the Plaintiff met with Dr. Azam Ansari, for a physical examination.  [T. 192-94].   Dr. Ansari provided provisional diagnoses of depression, currently under treatment; chronic low back pain that did not radiate to other parts of the Plaintiff's body; mild hypertension; mild mitral regurgitation; and moderate anemia,[1] likely due to an iron deficiency.  [T. 194].

On May 21, 2002, the Plaintiff met with Dr. Caryn Fine for a physical examination, and to follow-up on her anemia.  [T. 320].  Dr. Fine stated, "[t]his is a 43-year old woman with obviously marked iron deficiency," but also noted that, "on physical exam, she is a healthy-appearing woman in no acute distress."  Id.

On February 16, 2003, the Plaintiff met with Dr. Mary Yee.  [T. 327].  Dr. Yee noted that the Plaintiff's anemia was not responding to oral iron, and that she would probably be a candidate for intravenous iron.

---

[1]Generally, anemia is "a reduction below normal in the concentration of erythrocytes or hemoglobin in the blood," Dorand's Illustrated Medical Dictionary, at 77-78 (29th Ed. 2000).

2.      Medical Evidence Relating to Mental Impairments

On May 1, 2002, the Plaintiff began visiting the West Side Health Center for a mental health intake, and in order to seek assistance in applying for SSI. [T. 258].  On May 3, 2001, she completed the Beck Depression Inventory ("BDI") with her therapist, Nan Brumbaugh ("Brumbaugh").   The Plaintiff scored a sixty-four (64) on the BDI, which, according to Brumbaugh, is indicative of severe depression. Id.  The records reveal that the Plaintiff was deeply concerned with personal, family, and relationship issues, and that she felt pressured to work.  Id.

On May 10, 2001, the Plaintiff also began seeing Geoffrey Abbott ("Abbott"), who is a social worker with the University Family Physicians.  [T. 175].  Abbott interviewed the Plaintiff in order to assess her suicide risk, and to establish an initial mental health treatment plan.   Id.  Abbott reported that the Plaintiff was quite depressed, but that she did not want to kill herself because no one would look after her children.  However, she had thought about hanging herself.  Abbott noted that the Plaintiff was tearful for much of the time, but that "she seemed able to track well in the conversation and her thought processes seemed intact."  [T. 176].  Dr. Fenna also met with the Plaintiff and prescribed an antidepressant.

- 6 -

As noted, the Plaintiff met with Dr. Fenna on May 24, 2001, at which time, Dr. Fenna noted that the Plaintiff reported fatigue and difficulty in sleeping.  [T. 172].  The Plaintiff also reported having memory difficulties, and stated that she would forget to sign her name on documents, and would burn objects in the process of cooking.  [T. 173].

The Plaintiff initiated psychotherapy with Abbott on June 5, 2001.  [T. 170-71].  At that meeting, the Plaintiff represented that she felt better after being able to talk to someone, but that, on her bad days, she would be generally depressed, overwhelmed, and would feel pain throughout her thighs and upper body.  [T. 170].  Abbott's analysis reported, in part:

> Even though [the Plaintiff] has been experiencing her depressive symptoms for a long time, the symptoms do not seem to have substantially abated since their onset. Consequentially, I will, at least for now, use the diagnosis of Major depression, single episode, severe.

[T. 171].

On July 2, 2001, the Plaintiff transferred to the West Side Health Center for mental health services, and began meeting with Brumbaugh.  [T. 246-52].  Brumbaugh's diagnoses included chronic major depressive disorder, panic disorder, and post traumatic stress disorder.  [T. 251].  Brumbaugh also assigned the Plaintiff a Global

Assessment of Functioning score of 51.[2]  Id.  Brumbaugh also circled responses on the Mental Health Intake sheet that the Plaintiff reported symptoms of: suicidal ideation; depressed mood; middle insomnia; dizziness and faintness; decreased enjoyment, interest, or pleasure; decreased energy; impaired concentration as evidenced by cooking her baby's shoe and putting diapers in the refrigerator; feelings of hopelessness, worthlessness, guilt, and helplessness; daily panic attacks; depersonalization; excessive worry; memory problems; nightmares; hyper-vigilance; intrusive thoughts; emotional numbing; and exaggerated startle response.  [T. 247-48].

On August 2, 2001, the Plaintiff met with Brumbaugh again.  At that meeting, the Plaintiff represented that she had possibly thrown the medication away, but that she was seeking to refill her prescription.  [T. 239].  Brumbaugh noted that the Plaintiff appeared to be suffering panic attacks, and was potentially dissociating.  [T. 240].

---

[2]The Global Assessment of Functioning ("GAF") scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On the 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships. Id.

On August 6, 2001, Hli Xiong ("Xiong"), who is a social worker at West Side Health Center, aided the Plaintiff in filling out the necessary paperwork so as to apply for SSI benefits.  [T. 238].  At that meeting, the Plaintiff requested help in contacting the SSA, because she forgot when the SSA had scheduled her SSI application interview.  Id.  It was noted that the Plaintiff's appearance was confused, poorly groomed, and that the Plaintiff possessed noticeable breath odor.  Id.

On August 13, 2001, Ziong took the Plaintiff to her SSI application interview.  [T. 237].  At that time, the Plaintiff represented that she felt abnormal, like she was floating on air.  The notes also reflect that the Plaintiff was again poorly groomed and dressed, and that she possessed a noticeable breath odor.  Id.  With assistance, the Plaintiff completed her "Activities of Daily Living Questionnaire."  [T. 130-35, 241].

In the questionnaire, the Plaintiff represented that, before her impairments began, she was able to cook, clean, and take care of her children and home, and had improved grooming and hygiene.  [T. 130].  The Plaintiff advised that, since her impairments began, her oldest daughter, and her ten (10) year old daughter. assisted her with childcare, laundry, and shopping.  [T. 131, 134].  She also reported that she lacked the energy to take care of her personal hygiene, and required constant reminders from her daughter to wear clean clothes.  Id.  The Plaintiff represented that

she felt hopeless, helpless, stressed, and depressed; angered easily; was unable to stand for periods of time; and had difficulty lifting heavy objects.   She also represented that she had chronic fatigue, a lack of energy to care for herself or her children, and had difficulties with her memory, and in completing tasks.  [T. 134].

On November 7, 2001, the Plaintiff was seen by Dr. Jeffrey Richards, a psychiatrist.  [T. 221].  During the course of that visit, Dr. Richards took the Plaintiff's past medical history, and inventoried her symptoms of mental illness.   [T. 221-23]. Dr. Richards diagnosed depression recurrent, and post traumatic stress disorder, and he increased the Plaintiff's prescription for Remeron, and instructed the Plaintiff to continue her therapy with Brumbaugh.  [T. 226].

The SSA referred the Plaintiff on November 13, 2001, to Mark Schuler ("Schuler"), a psychologist, for a psychological assessment.   [T. 187-91].   At that evaluation, the Plaintiff reported that she was unable to work because of the surgery on her feet, and stomach. [T. 187].  She reported that she experienced fainting spells

when she worked, and that she was currently taking Remeron,[3] Ferrous Sulfate,[4] and Ibuprofen.   However, her pain medication would not work for more than three (3) hours.

In response to the questions pertaining to her activities and skills of daily living, the Plaintiff responded, as memorialized by Schuler, as follows:

> Ms. Lor begins her day around 5:00 AM.  She bathes every day.  She cooks for her family and said that she likes beef and rice.   She said that she does not have a very big appetite because she is too depressed.   She does the cleaning 2-3 times a week.   She goes shopping twice a week.  When she goes shopping, her daughter usually helps her.  She said that she does not know how to count money in this country.  Her daughter pays the monthly bills for the household.  She does not know how to dial the telephone, but she can talk on it.  She knows how to drive a car, but she does not drive very much because she is afraid she will have an accident because she worries too much.  She retires around 10:00 or 11:00 o'clock, but she cannot fall asleep because she thinks too much about her life.   She has nightmares about her parents 2-3 times a week.   They are dead.  She always dreams that she is in Laos.

[T. 188].

---

[3]Remeron, whose mechanism of action is unknown, is "indicated for the treatment of major depressive disorders." Physician's Desk Reference, at 2402 (57th Ed. 2003).

[4]Ferrous sulfate is "an iron supplement for iron deficiency and iron deficiency anemia." Physician's Desk Reference, at 1701 (59th Ed. 2005).

The interpreter, who was present at the evaluation, reported that the Plaintiff seemed to understand the questions posed, although she asked for them to be repeated on occasion.  [T. 188-89].  She "used some adult vocabulary, but also was described as making baby sounds sometimes."  [T. 189].

Schuler reported that, when the Plaintiff was asked to perform a simple three step task, "she completed two of the steps, but seemed unaware that she had not successfully completed the third step."  [T. 190].  Schuler opined, in part, that:

> It is felt that her description of her activities, combined with behavioral observations during the examination, suggest a very scattered level of functioning in a woman whose assimilation in this culture is idiosyncratic and not consistent.  That is, given the 22 years she has lived in this country, she has acquired some of the skills necessary to survive, but not all the important skills.  Furthermore, at the present time, her preoccupation with her problems, emotional and physical, seems to distract her from always using the skills she has.

> \*   \*   \*

> On structured tasks, Ms. Lor's performance was variable, performing somewhat better on tasks that were less formal.  She seemed preoccupied at times, missing important details.  However, she appears to be capable of attending to and learning simple tasks.  It is felt that in a work situation, she would be able to attend to and learn a simple, repetitive task.   However, her work pace would be variable, depending on her mood fluctuation and her pain issues.

- 12 -

Id.

Schuler diagnosed the Plaintiff with major depressive disorder, recurrent; moderate somatoform disorder,[5] not otherwise specified; and assigned the Plaintiff a GAF score of 45.  [T. 191].

The Plaintiff continued to meet with Brumbaugh, and continued to exhibit significant problems with memory, concentration, and bursts of anger. [T. 332-336].

The Plaintiff also met with treating psychiatrist, Dr. Jeffrey Richards.  Dr. Richards opined, in a letter dated January 8, 2003, that the Plaintiff was diagnosed with major depression, recurrent, in partial remission; post-traumatic stress disorder; and panic attacks with dissociation, which were responding to medications.  [T. 326].  Dr. Richards also concluded:  "I believe the symptoms are gradually diminishing with therapy."  Id.

On January 27, 2003, Brumbaugh completed a form entitled "Psychological Assessment: Ability to Do Work-Related Activities."  [T. 329-331] (hereinafter, "Psychological Assessment of January, 2003") .  The form included a scale, which

---

[5]A somatoform disorder is a mental impairment which is characterized by symptoms that are suggestive of a physical disorder, but which are actually of a psychogenic origin, and which are not under voluntary control.  Dorland's Illustrated Medical Dictionary, p. 532 (29th Ed. 2000).

consisted of ratings for "fair," defined as, "an ability to function in this area is seriously limited, but not precluded;" and for "poor or none," which was defined as "no useful ability to function in this area."  [T. 329].  Using the scale in the assessment form, Brumbaugh gave the Plaintiff either a "fair" or "poor or none" on every question related to "making occupational adjustments," "making performance adjustments," and "making personal-social adjustments."  [T. 329-30].

In assessing the Plaintiff's ability to make occupational adjustments, Brumbaugh noted that she had seen the Plaintiff for one and one-half  years, and that  "[t]here are time she functions ok but probably more times in which she functions poorly," and "[s]he experiences dissociation and angry outbursts her family can attest to."  [T. 330].  As to the Plaintiff's ability to make performance adjustments, Brumbaugh noted that "consistent problems with concentration and memory work make it difficult to comprehend," and that "[t]his, of course, is due to both depression and PTSD [i.e., Post Traumatic Stress Disorder]."  Id.  Brumbaugh noted that the Plaintiff was compliant with her medication, and that she appeared to improve as a result of the therapy, but continued to see the Plaintiff as "quite disabled," owing to the Plaintiff's memory difficulties and panic attacks.  [T. 331].

B.    <u>Hearing Testimony</u>.  The Hearing of January 27, 2003, commenced with some opening remarks from the ALJ, and the swearing-in of the Hmong interpreter. [T. 35].  After the Plaintiff's advocate delivered an opening statement, the ALJ began questioning the Plaintiff.  [T. 305-07].

The Plaintiff testified that she lived with her five (5) children, aged four (4) to eleven (11) years old, and that the children's father did not live with them.   [T. 35].  She stated that she was currently receiving $730.00 in income from welfare, and had never attended school.  <u>Id.</u>  She also testified that she worked back in her home country, and had also worked for one (1) year in the United States, but that she "couldn't do the job so they would not keep me."  [T. 36].  The Plaintiff stated that at her previous job, she would fit potatoes into a machine, which she claimed was not difficult, but she had to leave that position as she suffered from episodes of dizziness and blackouts.  She also stated that the problems were compounded by her Caesarian sections, and the surgeries on both of her feet.  [T. 36].

The Plaintiff testified that she continued to have problems with her feet, as well as with pain in her back.  [T. 37].  The Plaintiff stated that the pain was located in the "mid-back" and that it "goes up to the back of my neck," and "into my head and to my forehead and into my eye sockets."  <u>Id.</u>  The Plaintiff stated that the doctor had

prescribed pain medication, but that the medication's effects would provide only one (1) hour of relief.

When asked by the ALJ about her depression, the Plaintiff responded that its root cause was because the child protection services took away her two (2) children. [T. 37]. She related that her children were taken away because she left them behind while she applied for energy assistance for her public housing. [T. 38].

When asked about her daily activities, the Plaintiff responded that she performed some cooking for the children, and some household tasks, such as housecleaning and housekeeping. Id. She stated that her child, who was almost four (4) years old, did not attend daycare, or preschool, and stayed home with her. The Plaintiff testified that she tried to do the laundry and cooking for all of the children, but "cannot do as much." Id. She also testified that she lacked any family or relatives in the Twin Cities area. The Plaintiff stated that she had the ability to drive, but was "not driving as much anymore." Id.

The Plaintiff testified that she had not attended English as a second language classes, and had not gone to "Temple or any other Laotian association meetings of any sort." [T. 38-39]. The Plaintiff stated that she had not looked for any work since January of 1999, because she was "weak," and "not able to do any job." [T. 39].

- 16 -

The Plaintiff was then examined by her advocate, who began by questioning her about her daily activities.  [T. 39].  The Plaintiff stated that her daughter helped her with the laundry by, "com[ing] to pick up the laundry and take the laundry and does it and then brings it back to me."  Id.  She also testified that her daughter helps her whenever she was unable to do anything.  The Plaintiff stated that she did not have help cooking meals, as the "kids are so little."  She also testified that her daughter performed the grocery shipping, paid the bills, and managed the income from welfare.  [T. 39-40].  The Plaintiff represented that she lacked even rudimentary math skills.  [T. 40].

Upon inquiry by her advocate, the Plaintiff responded that she could not sleep at all, and stated that "I don't really sleep," and "I hardly sleep and one particular night I might sleep just one hour."  Id.  She represented that she constantly felt tired, which would lead to her dizziness spells, and that she would then lose her balance, blackout, or fall down, which occurred on a daily basis.  She would then become very angry which, if not aggravated by other circumstances, would subside in two (2) or three (3) hours.  The Plaintiff then testified that she would hallucinate -- seeing dogs, cats, or her own children.  [T. 40-41].

The advocate then asked the Plaintiff about her concentration and ability to follow directions.  [T. 41].  The Plaintiff responded that, "if somebody tells me to do something right then, right there then I can manage it, yes." "[b]ut if that person tells me to perform the task later on then I will tend to forget."  Id.  She also represented that she would sometimes have problems "finishing things," and that she would have problems remembering things at least two (2) or three (3) times a day, "because Hmong household tends to have many tasks to be performed, not like the American home."  Id.

The Plaintiff also testified that she did not believe that she could perform tasks as quickly as others, but could not provide a further explanation.  [T. 41-42].  She also represented that she could only focus on things immediately but, if there was a passage of time, then she would not know what to do.  [T. 42]. The Plaintiff also represented that she was unable to deal with stress, and had suicidal thoughts on a daily basis.  Id. At that point, the advocate had no further questions for the Plaintiff.

The Medical Expert ("ME"), and the Vocational Expert ("VE"), did not have any questions for the Plaintiff.  [T. 42].  The ALJ then asked the Plaintiff if she had any trouble sitting, standing, or walking, to which the Plaintiff responded that she would black out, and fall down on the floor, if she stood up.  [T. 42].  Upon inquiry by the

ALJ, the Plaintiff testified that she did not suffer from any side-effects from the medications that she was currently taking.

The ALJ then questioned the Plaintiff's daughter, Namaly Lor ("Lor").  Lor testified that she did not currently live with her mother.  [T. 43].  The ALJ then asked Lor about her mother's condition since January of 1999.  <u>Id.</u>  Lor responded:

> She's been memory loss.  I see it with my own eyes because we go to the store and she doesn't wear her shoes and on really cold days she doesn't even wear her jackets, so -- and she gets lost if she drives it if I'm not there. That's why I don't let her drive.  She doesn't clean her house because I go over there -- She doesn't clean her house, so I go over there three times a week, four times a week to clean her house, to help the kids do their homework.  I give -- I sometimes give her money for her bills because she doesn't have enough money for her bills too and I drive her places, go take her grocery shopping. I take her to do her laundry.  She's been fainting a lot.

[T. 44].

When asked by the ALJ as to when she last witnessed her mother's fainting spells, Lor responded that, "I never seen it."  <u>Id.</u>  Lor also testified that the Plaintiff suffers from panic attacks, depression, and suicidal thoughts.

Lor stated that she could not remember when her siblings were removed from her mother's house, as she was about two (2) years old at the time.  [T. 45].  She also stated that her mother was able to sew and cook.

The Hearing continued with the testimony of the ME.  [T. 383].  The ALJ asked the ME to opine as to the impairments from which she believed the Plaintiff suffered, based upon the Record.  [T. 46].  The ME testified that, under Listing 12.04, "there would be a diagnosis of major depression, recurrent severe," and under Listing 12.06, "the Claimant is diagnosed with post-traumatic stress disorder and panic attacks."  [T. 46].  Under the "A" criteria for Listing 12.04, the ME found "anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt, worthlessness and hopelessness, diminished concentration, suicidal ideation," and possibly hallucinations or delusional phenomena.  Id.  Under Listing 12.06, the ME also noted that the Plaintiff reported, "daily panic attacks lasting 30 minutes characterized by shortness of breath, dizzy spells, faintness, heart palpitations, choking, hot and cold flashes."  Id.  The ME also noted, under the "A" criteria, that the Plaintiff reportedly had experienced flashbacks, nightmares, intrusive thoughts, hyper-vigilance, exaggerated startle responses, and emotional numbing.  [T. 46-47].

Under the "B" Criteria of the Listings, the ME testified that, in regard to the Plaintiff's affective disorders, their combined impact would mildly impair the Plaintiff's activities of daily living, and moderately impair the Plaintiff's social functioning. [T. 47].  The ME stated that the Plaintiff would have moderate difficulties in maintaining

- 20 -

concentration, pace, and persistence; and that there had been no episodes of decompensation.  Id.

The ME also noted that, on the morning of the Hearing, the Plaintiff had just reported that she was now receiving home health care as of the beginning of the year.  Id.  The fact that she was now receiving such care "may imply a rather dramatic shift in her functioning because in the record she has reported in a number of places to be able to manage the tasks within her home * * * independently."  Id.

The ME also testified that the Plaintiff failed to establish any of the "C" criteria, noting that the Plaintiff's BCI depression score was 64, which indicates severe depression.  Id.  The ME also noted surprise that there was "some improvement in her condition," as the GAF scores went from 51 in July of 2001 to 60 in November of 2003, citing the January 2003 Psychological Assessment.  [T. 48, 329-331].  However, the January 2003 Psychological Assessment did not report a GAF score.  [T. 329-331].

The ME added that the January 2003 Psychological Assessment was consistent with the January of 2003 grant of home health care, and that for "the greater part of the record," the statements of disability were "more severe than what was in the record in terms of what she reported to the care taker she was able to do."  The ME concluded

that, "[p]erhaps they represent some worsening of the depression or some change in the depression," as of January 2003.  [T. 48].

When asked by the ALJ, the ME responded that, prior to the exhibits of January of 2003, the Plaintiff would be limited to work that was simple and unskilled.  Id. Such work could not have high production goals, or require rapidly paced work, but instead, would have to be in an environment with few daily procedural changes and with only incidental public contact.  [T. 48-49].

The Plaintiff's advocate then questioned the ME about the Plaintiff's dissociative behavior -- which included symptoms of dizziness, numbness, and difficulty in swallowing -- that were reported in the Record.  [T. 49].  The ME stated that, in a number of places throughout the Record, a history of dissociation was reported, including what the ME thought could be "anxiety symptoms of the panic attack."  Id.  The ME opined that such behavior would likely distract somebody from their tasks, and that, while a person was adjusting to a new environment, such behavior would be exacerbated.  Id.

Thereafter, the Hearing continued with the ALJ posing a hypothetical to the VE, which asked him to assume an individual, who was thirty-nine (39)  years of age, without a formal education, and with the past work experience as set forth in the VE's

report, who was on a number of medications without apparent side effects, and who was impaired with hypertension, chronic back and foot pain, major depression, PTSD with a panic disorder, and who was limited to lifting and carrying twenty (20) pounds occasionally, and ten (10) pounds frequently. The hypothetical also included someone who could only do work in a low stress environment, where minimal industrial standards for production and pace were applicable, in a work setting that would have minimal procedural changes, and did not require an understanding of English. [T. 50-51]. The hypothetical work also had to be simple and unskilled in nature, and would not involve heights, ladders, scaffolding or foot pedal manipulation. [T. 51].

With those limitations in mind, the VE testified that the hypothetical individual would be able to perform the Plaintiff's past jobs in assembly, with the caveat that there would be productivity goals, but that those in food and sticker assembly positions would be modest. Id. The VE opined that there would be 65,000 such assembly jobs in Minnesota, but only 35,000 of those would be of a light, unskilled nature. Id.

The ALJ then inquired into the availability of any other simple, unskilled jobs, within the region, that could be performed by the hypothetical individual. Id. The VE testified that other potentially applicable light jobs would be found in laundry work --

- 23 -

particularly in pressing and hand sewing, of which there were 4,000 such positions in Minnesota.  The VE testified that there were roughly 10,000 light hand packaging jobs available in the State that would also be suitable.  The ALJ's questioning of the VE concluded with the VE stating that there was no discrepancy between the VE's testimony, and the DOT.  Id.

The VE was then questioned by the Plaintiff's advocate.  [T. 52].  When asked about the Plaintiff's problem in understanding simple instructions, the VE opined that the Plaintiff would be limited to an "unskilled" profile, and a job that could be learned by demonstration.  Id.  The VE also opined that, while the cited jobs would have minimal productivity expectations, if those were not met on a regular basis, the hypothetical person's position would be in jeopardy.

The Plaintiff's advocate inquired whether the jobs cited by the VE were appropriate for a person having difficulties with concentration,  and with an inability to perform basic math.  The VE stated that the unskilled, repetitive nature of the work did not emphasize concentration, and could be performed by people who could count on fingers or fill a fixture, which would not require any more than minimal math requirements.  [T. 52-53].  The VE also stated that his opinion, on the number and

types of unskilled jobs, considered and accounted for minimal standards of productivity and pace and memory.  [T. 53].

The ALJ then concluded the Hearing by adding a further restriction on the hypothetical, namely, that the instructions for the job would have to be demonstrated. [T. 54].  The VE opined that the numbers of available jobs would not be altered by that restriction, which accounted for a requirement of simple, unskilled labor which did not require English.  Id.  The ALJ also granted the Plaintiff the opportunity to present a post-Hearing brief, which was submitted by the Plaintiff's advocate, and which reiterated the contents of the Record.  [T. 157-60].

C.    The ALJ's Decision.  The ALJ issued her decision on May 12, 2003.  [T. 25-30].  As she was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by 20 C.F.R. §416.920.[6]  As a threshold matter, the ALJ

---

[6]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

(1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual

(continued...)

concluded that the Plaintiff had never engaged in substantial gainful activity.  [T. 29].

Next, the ALJ examined whether the Plaintiff was subject to any severe physical or mental impairments, which would substantially compromise her ability to engage in work activity.   After considering the Plaintiff's medical history, and the testimony adduced at the Hearing, the ALJ found that the Plaintiff, under Listing Section 12.04, was severely impaired by depression with symptoms of anhedonia, appetite disturbance, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating, thought of suicide, and hallucinations, delusions, and paranoid thinking, based upon her treatment records from the West Side Community Clinic. [T. 28].   The ALJ also found that  the Plaintiff, under Listing Section 12.06, was

---

[6](...continued)
> functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy.  Id. at 754.

severely impaired by panic attacks, and recurrent and intrusive recollections of a traumatic experience, consisting of panic attacks and a post-traumatic stress related disorder.  Id.  The ALJ also found that there were few objective findings which corroborated the Plaintiff's allegation of physical problems, except for the Plaintiff's anemia.  The ALJ concluded that the few physical problems would have no more than a minimal effect on the Plaintiff's ability to function, and that the mental impairments were improving, and were responding to medication and psychotherapy.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §416.920(d).  The ALJ determined that the Plaintiff's physical and psychological impairments did not meet, nor equal, the criteria of any Listed Impairment.  [T. 28-29].

The ALJ then discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure.  See, 20 C.F.R. §416.920(a).  The four broad areas, which are relevant to the ability to work, are:  activities of daily living ("ADL"); social functioning; concentration, persistence, or pace; and episodes of decompensation. Id.  After examining the medical evidence, the ALJ concluded that the Plaintiff was subject to depression under Section 12.04, and panic attacks and post-traumatic stress

disorder under Section 12.06.  The ALJ then addressed what limitations might result from the Plaintiff's mental impairments.  [T. 28].

With regard to the pertinent factors, the ALJ determined that, because of her mental impairments, the Plaintiff had "moderate" difficulties in the area of concentration, persistence, and pace, and "mild" restrictions in her ADL, and social functioning.  Id.  In addition, the ALJ found that the Plaintiff's mental impairments did not meet, or medically equal, the "C" criteria, as set forth in Section 12.00 of the Listings.  Id.

The ALJ based that determination on the testimony of the ME, the records memorializing the examinations by Schuler and Dr. Richards, and the records provided by Brumbaugh who, the ALJ noted, was "not a medically acceptable source."  [T. 27-28].  The ALJ also found that the Plaintiff's testimony regarding her impairments and limitations were "only minimally credible."  [T. 29].

The ALJ then proceeded to determine the Plaintiff's RFC, which was found to be as follows:

> The claimant retains the residual functional capacity to perform light work which is simple, low stress, routine and does not require the use of English, does not require exposure to heights or machinery and does not require the use of foot pedals.

[T. 29].

The ALJ, in her decision, did not discuss what factors were considered in formulating the RFC, or the basis upon which she had discounted the Plaintiff's testimony regarding her impairments.

Proceeding to the Fourth Step, the ALJ determined that the Plaintiff had no past relevant work to which she could return.  Id.  Accordingly, the ALJ noted that the burden shifted to the Commissioner to establish the final step; namely, whether there were other jobs, which existed in significant numbers in the national economy, that the Plaintiff could perform given her RFC, age, education, and work experience.  [T. 28]. The ALJ noted that the Plaintiff was 39 years old at the time of her application for benefits, which was defined as a younger individual.  [T. 29]; see also, Title 20 C.F.R. §416.963.  As related by the ALJ, considering the Plaintiff's age, education, past relevant work experience, and RFC, the VE had opined that the Plaintiff could perform work, namely assembly and packing of food, laundry work, and hand packaging, of which over 100,000 jobs existed in the regional economy.  [T. 29].  The ALJ also noted that the mathematics in hand packaging could be managed by finger counting, and that the number of jobs would be limited if an individual's memory were very poor.  The ALJ concluded that the Plaintiff was not disabled, and therefore, was not entitled to a period of disability, or DIB.  [T. 29-30].

IV.  Discussion

A.    Standard of Review.    The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services,

16 F.3d 967, 969 (8th Cir. 1994); <u>Thomas v. Sullivan</u>, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005), citing <u>Nelson v. Sullivan</u>, 966 F.2d 363, 366 n.6 (8th Cir. 1992); <u>Moad v. Massanari</u>, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, "[s]ubstantial evidence is something less than a preponderance, but enough that a reasonable mind would conclude that the evidence supports the decision."  <u>Banks v. Massanari</u>, 258 F.3d 820, 822 (8th Cir. 2001). Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'" <u>Vandenboom v. Barnhart</u>, 412 F.3d 924, 927 (8th Cir. 2005), quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004); <u>Howard v. Massanari</u>, 255 F.3d 577, 581 (8th Cir. 2001), quoting <u>Mapes v. Chater</u>, 82 F.3d 259, 262 (8th Cir. 1996).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995); <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

B.     Legal Analysis.  In support of her Motion for Summary Judgment, the Plaintiff advances the following arguments:

> 1.     The ALJ Improperly Disregarded the Opinion of Brumbaugh, the Plaintiff's Treating Therapist, and Relied on the ME in Finding That the Plaintiff's Severe Ailments Were Not Disabling.

2.     The ALJ Improperly Discounted the Testimony of
the Plaintiff and the Plaintiff's Daughter.

3.     The ALJ Posed a Deficient Hypothetical to the VE.

Ordinarily, we would address each of the Plaintiff's objections, in turn, but we are

unable to responsibly do so, here, given the superficial, and uncritical nature of the

ALJ's analysis.   In such circumstances, in order to avoid simply being a "rubber

stamp" to the ALJ, a remand is appropriate.  See, Pettit v. Apfel, 218 F.3d 901, 903-04

(8th Cir. 2000)(remand necessary where ALJ's factual findings are insufficient for

judicial review), citing Senne v. Apfel, 198 F.3d 1065, 1067-68 (8th Cir. 1999)(same);

see also, Griffon v. Bowen, 856 F.2d 1150, 1153 (8th Cir. 1988)("[Judicial review of

Commissioner's determination] is not a rubber stamp for the ALJ * * *.").  We find

the ALJ's decision to be so wanting in critical analysis as to warrant a remand.

A most critical issue before us is whether the Plaintiff's severe mental

impairments satisfy the Listings for affective disorders (Listing 12.04) or personality

disorders (Listing 12.06).  The ALJ determined that those impairments were not of

Listing severity and, in so concluding, the ALJ relied upon the testimony of the ME.

In the words of the Commissioner:

[The Plaintiff's] assertion that her mental condition satisfies
the requirements of two listed impairments is correct, only
if the subjective testimony of Ms. Lor and her daughter is

- 33 -

accepted as credible.   In contrast to the testimony of [Plaintiff] and her daughter, the ALJ relied on the testimony of the medical expert, Dr. Butler, to find that [the Plaintiff] did not satisfy the "B" criteria requirements of any of the listed impairments regarding mental disorders.

Defendant's Memorandum in Support of Motion for Summary Judgment, at p.12.

Notably, the Commissioner concedes the criticality of the ALJ's assessment of the credibility of both the Plaintiff, and of her daughter, and of the ALJ's reliance upon the opinion of the ME, in determining that the Plaintiff was not disabled at Step Three, or any other Step in the sequential analysis.

Starting with the ALJ's assessment of the Plaintiff's believability, as well as that of the Plaintiff's daughter, the ALJ simply cites to Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), see, T. 27, but does not, indirectly or otherwise, apply the Polaski regimen in reaching the finding that the "claimant's testimony regarding her impairments and limitations was only minimally credible." [T. 29].  Within this Circuit, it is axiomatic that the factors which the ALJ must consider, in the evaluation of the Plaintiff's subjective complaints include "the claimant's prior work history; daily activities; duration, frequency, and intensity of the pain; dosage, effectiveness and side effects of medications; precipitating and aggravating factors; and functional restrictions." Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005), citing O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003), citing in turn, Polaski v. Heckler, supra.

"[A]n ALJ 'need not explicitly discuss each Polaski factor,'" id., quoting Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004), for "[i]t is sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints." Id.

"We 'will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain.'" Id. at 792, quoting Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). "In rejecting a claimant's complaints of pain as not credible, we expect an ALJ to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005), quoting Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003). Here, we would defer to the ALJ's credibility assessments if the ALJ had provided "good reasons and substantial evidence," for the believability findings reached. Id. at 801. Our close review of the ALJ's decision has failed to locate any credibility assessment of either the Plaintiff's testimony, or that of her daughter. Indeed, we are unable to ascertain, given the content of the ALJ's decision, what testimony was "minimally credible," or why it was so.

At no point in her decision has the ALJ identified any inconsistencies in the Plaintiff's testimony, and our review of the clinical notations of Record demonstrates

that the symptoms expressed by the Plaintiff were consistent with the medical histories that she provided to her health care professionals over the course of her treatment.  If it were sufficient for an ALJ to simply state that the claimant was unbelievable, then the ALJ's decision, here, would suffice, but such sophistry would undermine any legitimacy to the function of judicial review.  While we understand that the ALJ adopted the testimony of the ME as to effect of the Plaintiff's mental impairments, that adoption did little more than abdicate the ALJ's sole function, in assessing the believability of testimony, to the ME, who provided no meaningful explanation as to why the Plaintiff only exhibited "mild" restrictions in her activities of daily living, or "moderate" difficulties in maintaining social functioning and in concentration.  [T. 47].  Frankly, the Record contains numerous clinical notations which are at odds with the ME's assessment, and we are at a loss to know what weight, if any, was placed upon those notations or, if no weight, why.

The credibility of the Plaintiff's daughter escaped any analysis, much less one compliant with <u>Polaski</u>.  While the Commissioner urges that inconsistencies existed, between the Plaintiff's testimony, and that of her daughter, we have no means of knowing whether those inconsistencies were ever considered by the ALJ, or were found to be material.  In reality, the Plaintiff, her daughter, and the Plaintiff's clinical

notations, which were authored by a variety of heath care professionals, detail significant limitations on the Plaintiff's capacity to engage in a normal range of daily activities, to socially function, and to effectively concentrate.   Nonetheless, the assessment of this evidence, by the ALJ, is nonexistent.   We should not be required to accept, as an act of good faith, that an ALJ completed the rigors of analyzing the evidence unless there is a showing that the evidence was considered and rejected, or considered and found to be corroborated by the Record as a whole.   Accordingly, we find the ALJ's credibility assessments to be wholly wanting which, in an of itself, requires a remand.   Polaski continues to require something more than mere lip service.

In addition, we find the ALJ's treatment of the medical record unsettling.   To be sure, Brumbaugh is not an "acceptable medical source."   See, Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005)("A therapist is not an 'acceptable medical source' to establish 'a medically determinable impairment.'"), citing 20 C.F.R. §416.913(a) (1)-(5); Flaherty v. Halter, 182 F. Supp.2d 824, 828 (D. Minn. 2001)(citing cases that, among other disciplines, social workers are not a "treating source"), citing Bird v. Apfel, 43 F. Supp.2d 1286, 1291 (D. Utah 1999).   Accordingly, we have no complaint with the ALJ's implicit refusal to given deferential weight to the opinions expressed by Brumbaugh.   As our Court of Appeals has observed, "a therapist's assessment is

- 37 -

considered 'other medical evidence,'" 20 C.F.R. 416.913(d)(1), and, in "determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." Raney v. Barnhart, supra at 1010, citing 20 C.F.R. §416.927(d)(4).

When confronted by medical evidence, such as presented in this Record by Brumbaugh, the ALJ is obligated to give such weight to the evidence as is warranted by considering the "examining relationship" between the claimant and Brumbaugh; the "treatment relationship" between the claimant and Brumbaugh, its "length," and "nature and extent;" the "supportability" of Brumbaugh's opinions, given the medical and laboratory findings; the "consistency" of Brumbaugh's opinion with the Record as a whole; Brumbaugh's "specialty," and its relationship to the opinions expressed; in addition to "other factors." 20 C.F.R. §416.927(d). With specific respect to Brumbaugh's opinion, the ALJ conducted no assessment, as would comply with Section 416.927(d), but simply declared that "Brumbaugh is not a medically acceptable source." [T. 28]. We, as a reviewing Court, should not be undertaking, in the first instance, an assessment concerning the weight to be afforded medical opinions, whether from "treating" or "other" sources.

Nor are we persuaded that the ME's opinions were entitled to controlling weight -- even in the absence of the opinions expressed by Brumbaugh.   As but one telling example, the ALJ relied on the ME's testimony "that there was some evidence in the record that the claimant's condition was improving as her latest GAF was 60."   [T. 28].   For this proposition, the ALJ cites to Exhibit 16F, which was an appraisal of the Plaintiff, by Brumbaugh, in January of 2003, and which contains no GAF score whatsoever.   Indeed, one would be hard-pressed to construe the contents of Exhibit 16F as intimating any improvement in the Plaintiff's mental impairments.   In truth, the ME was comparing a GAF score of 51, which was reported in Exhibit 7F, at p. 38, and was rendered by Brumbaugh on July 2, 2001, with a GAF score of 60,[7] which was reported in Exhibit 7F, at p. 13, and was assessed on November 7, 2001, by Dr. Richards.   [T. 47-48].   As both the ME and the ALJ concluded, such a comparison

---

[7]Given the content of Dr. Richards' assessment of the Plaintiff's mental impairments on November 7, we find it somewhat difficult to accept the GAF score as valid.   Dr. Richards' inventory of the Plaintiff's symptoms evinces significant impairments in cognition, together with symptoms including, among many others, suicidal ideations, hallucinations, delusions, panic attacks, and the like.   [T. 221-223]. Indeed, as an apparent result of that examination, Dr. Richards' decided to increase the Plaintiff's dosage of Remeron, which would not be reflective of any generalized improvement in her condition.   [T. 226].   Frankly, we question whether Dr. Richards' GAF score is not a poorly inscribed "50" but, for these purposes, we accept the score of 60, as did the ME, and the ALJ.   Id.

of GAF scores would suggest an improvement in the Plaintiff's mental condition from a 51 to 60.

Unfortunately, neither the ME, nor the ALJ, conducted a searching assessment of the medical evidence.  In point of fact, on November 13, 2001, Schuler conducted a psychological evaluation of the Plaintiff, which would have been only six days after the evaluation by Dr. Richards.  See, Exhibit 4F.  In that evaluation, Schuler assessed the Plaintiff with a GAF score of 45.  [T. 191].  If accepted as valid, Schuler's GAF assessment would indicate that the Plaintiff's condition deteriorated during the same period of time that the ME, and the ALJ, concluded that it had improved.  Given the superficiality of the ALJ's analysis of the Record, we are not surprised that the stark conflict between Dr. Richards' GAF score, and that of Schuler, were not further addressed.  The parties deserved a disciplined assessment of the Record as a whole and, here, no such assessment was rendered, and accordingly, a remand on this ground is also warranted.[8]

---

[8]We do not overlook Dr. Richards' conclusory note, [T. 326], in July of 2003, to the effect that the Plaintiff's symptoms are gradually diminishing with therapy and medications, but we find that bald assertion to conflict with Brumbaugh's contemporaneous assessment.  [T. 329-331].  Moreover, we read the ME's testimony to credit Brumbaugh's impressions, as the ME felt that Brumbaugh's assessment might "represent some worsening of the depression or some change in the
(continued...)

Lastly, contrary to the view expressed by the Plaintiff, we cannot agree that the Record substantially supports an award of benefits at Step Three or, for that matter, at any other Step. Whether the Plaintiff is entitled to SSI will depend on the conduct of a rigorous assessment of her credibility, and that of any witnesses called on her behalf, and will demand a thorough and exacting appraisal of the medical evidence than has occurred to date. We recognize that this case presents some fairly unique problems, as the Plaintiff does not speak English, is unable to compute math, has never held gainful employment, and has experienced a long history of severe mental impairments. Nonetheless, the Plaintiff is entitled to a fair consideration of her claim for benefits, and we are convinced that the ALJ failed to competently assess the Record on the whole. Accordingly, we recommend that the matter be remanded to the Commissioner for further proceedings consistent with this Report.[9]

---

[8](...continued)
depression." [T. 48]. Notably, the ME found Brumbaugh's assessment consistent with the decision to provide the Plaintiff with home care, see, Exhibit 11E; [T. 47]; a development which occurred in January of 2003, and which should bear on the ALJ's and the ME's assessment of how the Plaintiff's impairments impact upon her daily activities, but there does not appear to be any such assessment in this Record.

[9]We would add that, as to the Plaintiff's last objection -- namely, that the ALJ's hypothetical to the VE was defective, we conclude that, given the significant defects in the ALJ's analysis, which we have detailed in the text of this Opinion, the ALJ's

(continued...)

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 10] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No. 17] for Summary Judgment be denied.

3.      That this matter be remanded to the Commissioner for further proceedings in accordance with this Report.

4.      That, pursuant to the holding in Shalala v. Schaefer, 509 U.S. 292 (1993), Judgment be entered accordingly.

Dated:  December 9, 2005                  s/Raymond L. Erickson

                                          Raymond L. Erickson
                                          CHIEF U.S. MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by

---

[9](...continued)
hypothetical was unavoidably defective.

filing with the Clerk of Court, and by serving upon all parties **by no later than December 29, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 29, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.